**Semyon KLYUCH, Plaintiff,**

v.

**FREIGHTMASTERS, INC., Defendant.**

**No. Civ.03–6135 PAM/RLE.**

United States District Court,
D. Minnesota.

Jan. 10, 2005.

See also, 2005 WL 318786.

---

Beth Bertelson, Bertelson Law Office, Minneapolis, MN, for Plaintiff.

James F Baldwin, Moss & Barnett, Minneapolis, MN, for Defendant.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter is before the Court on Defendant's Motion for Summary Judgment. For the reasons that follow, the Motion is granted in part and denied in part.

## BACKGROUND

### A. Klyuch's Employment

Plaintiff Semyon Klyuch was born and raised in Russia, and moved to the United States in 1980. Klyuch was employed by Defendant Freightmasters, Inc. ("Freightmasters") from 1989 to January 2003. Klyuch began as a dockworker in 1989, and following an injury in 1995, was transferred to an evening dispatcher position in the Regional Transportation Services ("RTS") division. As an evening dispatcher, Klyuch typically worked from 11:00 a.m. to midnight, Sunday through Thursday. He reported to Timothy Kroska, manager of the RTS division, and Tim Beltz, vice president of the RTS division. Klyuch conformed to performance expectations while employed at Freightmasters and generally maintained good working relationships with his co-workers and Freightmasters' customers.

In late 2001, Klyuch inquired about moving from an evening shift position to a day shift position. Klyuch spoke with various employees at Freightmasters about his desire to change positions. Despite Klyuch's interest and his inquiries, there were no day shift openings. Freightmasters claims that in November 2002, Klyuch told Kroska and other Freightmasters' employees

that he would quit his job unless his shift changed by February 1, 2003. (Young Aff. Ex. 3 at 52, 81 (Kroska Dep.); Ex. 5 at 27 (Gibson Dep.).) Human resources personnel allegedly interpreted this statement at an ultimatum. Klyuch disputes that he gave such an ultimatum, but admits that he communicated his desire to change shifts with human resource personnel and other division managers in an attempt to find an open day position. (Bertelson Aff. Ex. 11 at 100–101 (Klyuch Dep.).)

In November 2002, Klyuch and Beltz had a disagreement. Freightmasters maintains that Klyuch was disrespectful and expressed profanities to Beltz, while Klyuch maintains that Beltz was disrespectful to him by calling him "son of bitch" and "stupid." According to Freightmasters, Beltz told Kroska of Klyuch's behavior, and they agreed that Freightmasters should end Klyuch's employment. However, Kroska convinced Beltz to wait until January 2003 when business slowed to terminate Klyuch. When Beltz learned of Klyuch's alleged ultimatum to leave Freightmasters, Beltz chose not to inform human resources of his decision to terminate Klyuch because he believed that Klyuch's alleged ultimatum obviated the need for termination.

In response to Klyuch's request for a day shift position, human resources advertised and interviewed candidates to replace Klyuch in his current evening shift position. On January 2, 2003, Freightmasters hired Richard Roy and began training him in Klyuch's position. (Young Aff. Ex. 5 at 39–40; Ex. 7 at 7–10 (Roy Dep.).) Roy is neither Russian nor Jewish, and had less experience as a dispatcher than Klyuch. (Young Aff. Ex. 6 at 11.) Nevertheless, Roy was paid $3.00 more per hour that Klyuch. (Bertelson Aff. Ex. 13 at 66 (Kroska Dep.).)

On January 16, 2003, Beltz informed human resources that Roy had finished training and could take over Klyuch's position. Human resource personnel consulted with the managers of the various divisions to determine whether a day shift position was available. Because no day shift positions had become available, Freightmasters made the decision to terminate Klyuch's employment on January 20, 2003. (Bertelson Aff. Ex. 11 at 107.) Shortly thereafter, Freightmasters also terminated Sasha Klyuch, Klyuch's son, due to job elimination. (Bertelson Aff. Ex. 13 at 50, 51.)

### B. Discriminatory Remarks

Throughout his employment, Klyuch maintains that Beltz made numerous discriminatory remarks to him about his Russian heritage and his Jewish faith. Specifically, sometime in 2001, Klyuch alleges that Beltz commented to him that Orthodox Jews are "weirdos," and that Hannukah is a "ha, ha, ha, is that a funny holiday." (Bertelson Aff. Ex. 11 at 65, 67.) Klyuch also alleges that after he was terminated, Beltz asked Kroska if Kroska missed his "fat Jew friend." (*Id.* at 81.) Beltz denies that he made these comments.

Klyuch further claims that Beltz made comments to Klyuch about his Russian heritage. In particular, Klyuch contends that, when Freightmasters had a large amount of vodka waiting for shipment, Beltz told his employees to "keep the Russians away from those skids, because it will disappear; we will have a shortage of cases of vodka." (*Id.* at 80.) Klyuch further contends that Beltz stated "give the vodka to the Russian." (*Id.* at 91.)

### C. Klyuch's Claims

Klyuch claims that Freightmasters discriminated against him based on his na-

tional origin, religion, and race in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, and the Minnesota Human Rights Act ("MHRA"), Minn.Stat. § 363.01 *et seq.*[1] Freightmasters denies that it discriminated against Klyuch, and contends that summary judgment is appropriate because Klyuch has not presented any evidence of intentional discrimination.

## DISCUSSION

### A. Standard of Review

Summary judgment is appropriate if no genuine issue of material fact exists, such that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the evidence in favor of the nonmoving party and give that party the benefit of all justifiable inferences. *Id.* at 250, 106 S.Ct. 2505. The burden of demonstrating that there are no genuine issues of material fact rests on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must set forth specific facts sufficient to raise a genuine issue of fact for trial. *Id.* at 324, 106 S.Ct. 2548. In employment discrimination cases, the Eighth Circuit has cautioned that summary judgment should be granted sparingly. *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994).

### B. Discrimination

Title VII and the MHRA prohibit an employer from discriminating against an employee based on national origin, race, and religion. 42 U.S.C. § 1981 prohibits discrimination against members of racial minorities. Both Title VII and § 1981 claims are analyzed under the Civil Rights Act of 1991. Claims under the MHRA, however, are analyzed under the paradigm articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

### 1. Federal Claims

■ Historically, how courts analyze Title VII discrimination claims has depended on whether a plaintiff has presented direct or indirect evidence of discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 269–70, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Under this dichotomy, if a plaintiff presents direct evidence of discrimination, then courts must proceed under the mixed-motive standard. *See Mohr v. Dustrol*, 306 F.3d 636, 639–40 (8th Cir. 2002). Once the plaintiff presents direct evidence that discrimination was a motivating factor in the employment decision, the burden shifts to the employer to prove that it would have reached the same decision in the absence of discrimination. *See Gagnon v. Sprint Corp.*, 284 F.3d 839, 847–48 (8th Cir.2002).

■ On the other hand, if a plaintiff presents indirect evidence of discrimination, then courts must proceed under the single-motive analysis articulated in *McDonnell Douglas. See id.* Under this standard, the plaintiff must first establish a prima facie case of discrimination. *See id.* Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a non-discriminatory reason for the employment action. *See id.* If the employer identifies such a reason, then the burden shifts back to the plaintiff to present sufficient evidence that the proffered reasons was really a pretext for intentional discrimination. *See id.* The bur-

---

**1.** Klyuch's Title VII claim is based on his national origin and religion; his § 1981 claim is based on his race (Jewish); and his MHRA claim is based on his national origin, religion and race (Jewish). Klyuch has withdrawn his age discrimination claim.

den of persuasion always remains with the plaintiff. *See id.*

However, in *Desert Palace v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), the Supreme Court abrogated the proposition that whether courts apply *McDonnell Douglas* or a mixed-motive analysis depends on the presentation of direct or indirect evidence. *Desert Palace,* 539 U.S. at 98–99, 101, 123 S.Ct. 2148. The Supreme Court further acknowledged that direct and indirect evidence were equally persuasive in proving employment discrimination, and that the key issue in such cases is whether intentional discrimination occurred. Since *Desert Palace,* various district courts within the Eighth Circuit have attempted to interpret whether *Desert Palace* affected the analysis used at the summary judgment stage of a Title VII employment discrimination lawsuit. *See e.g., Dunbar v. Pepsi–Cola Gen. Bottlers of Iowa, Inc.,* 285 F.Supp.2d 1180 (N.D.Iowa 2003); *Dare v. Wal–Mart,* 267 F.Supp.2d 987 (D.Minn.2003) (Magnuson, J.). Despite these efforts, the Eighth Circuit recently determined that *"Desert Palace* had *no* impact on prior Eighth Circuit summary judgment decisions." *Griffith v. City of Des Moines,* 387 F.3d 733, 736 (8th Cir.2004), *reh'g denied,* File No. 03–3266 (8th Cir. Dec. 17, 2004) (emphasis in original). Thus, how the Court analyzes Klyuch's claims depends on whether Klyuch has presented direct or indirect evidence of discrimination.

Although this Court is bound to follow the law as interpreted in the Eighth Circuit, the Court notes its disagreement with the Eighth Circuit's interpretation of the Civil Rights Act of 1991. *See id.* at 739–48 (Magnuson, J., concurring specially). In 1991, Congress amended the Civil Rights Act of 1964, and clarified that a plaintiff establishes an unlawful employment practice when he or she "demon-

strates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m). Rather than prohibiting only employment decisions motivated *primarily* by discrimination, Congress sought to impose liability on the employer if discrimination was *a* motivating factor, no matter how slight, in the employment decision. This amendment eviscerated the indirect/direct evidence distinction articulated in *Price Waterhouse.* Without this evidentiary distinction, *McDonnell Douglas* should have fallen into disuse and the "motivating factor" test articulated in the amendment should have emerged. Nevertheless, courts have ignored the Civil Rights Act of 1991 and have duly followed *Price Waterhouse.* Though this Court has opined that *Desert Palace* signaled the demise of *McDonnell Douglas, see Dare,* 267 F.Supp.2d at 990–93, the Eighth Circuit has found otherwise. *Griffith,* 387 F.3d at 736; *but see id.,* 387 F.3d at 739–48. Bound by this precedent, this Court must analyze Klyuch's claims accordingly.

a. *Direct Evidence*

Direct evidence of discrimination includes "conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude in such a way that the fact finder could infer" that discrimination was a motivating factor in the employer's decision. *Gagnon,* 284 F.3d at 848. However, "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" are insufficient to support a direct inference of discrimination. *Id.* If Klyuch can present such direct evidence of discrimination, "the burden then rests with [Freightmasters] to convince the trier of fact that

it is more likely than not that the decision would have been the same absent consideration of the illegitimate factor." *Price Waterhouse,* 490 U.S. at 276, 109 S.Ct. 1775.

■ Klyuch has presented evidence that Beltz made comments that referenced Klyuch's Russian nationality and Jewish religion. Freightmasters contends that Beltz was not a decisionmaker and that these alleged comments were stray remarks. Freightmasters submits that human resource personnel made the decision to terminate Klyuch independent of Beltz's previous decision to fire Klyuch. Freightmasters further submits that the alleged discriminatory comments, as they relate to Klyuch's national origin and religion, are unrelated to Klyuch's employment relationship with Freightmasters.

For purposes of this Motion, the Court assumes that Beltz indeed made the decision to terminate Klyuch, and that Beltz made the comments about Klyuch. Nevertheless, Beltz's allegedly discriminatory comments are unrelated to Klyuch's employment, ability to perform his job, or his termination. Klyuch must establish a causal link between Beltz's comments and his termination. *See Simmons v. Oce–USA, Inc.,* 174 F.3d 913, 916 (8th Cir. 1999). In this case, Beltz's remarks bore no connection to Klyuch's employment status or to the conduct of Freightmasters' business. *See Rivers–Frison v. Southeast Mo. Comm. Treatment Ctr.,* 133 F.3d 616, 619 (8th Cir.1998). Furthermore, Klyuch cannot specifically identify when these comments were made during his fourteen years employment. Thus, the Court finds that these stray remarks are insufficient to mandate a direct evidence analysis.

b. *Indirect Evidence*

■ Unlike direct evidence, indirect evidence does not directly point to the existence of a discriminatory motive, but nonetheless permits the trier of fact to infer discrimination. For example, "[p]roof that the [employer's] explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination." *Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 134, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Because Klyuch fails to present direct evidence of discrimination, Klyuch must meet the standard articulated in *McDonnell Douglas* to prevail on his Title VII, § 1981, and MHRA claims.

For purposes of this Motion, Freightmasters concedes that Klyuch has established a prima facie case of discrimination. (Def.'s Reply Mem. at 7.) Freightmasters submits that it terminated Klyuch because of the ultimatum he gave to Freightmasters' management and human resource personnel. Klyuch asserts that this reason is a pretext for discrimination.

■ The pretext inquiry requires the Court to examine whether the "proffered reason was in fact the real reason the employer acted or if it was really a pretextual explanation for intentional discrimination." *Moschetti v. Chicago, Cent. & Pac. R.R. Co.,* 119 F.3d 707, 710 (8th Cir.1997). The Court is not required to "second guess" the employer's business decision or determine whether the "employer's explanation was a good or bad business reason." *Id.* Rather, the Court must evaluate whether Klyuch has presented sufficient evidence to allow a reasonable fact finder to infer that intentional discrimination, rather than the proffered reason, was the real reason for his termination. *See id.* Evidence of pretext includes showing that the proffered explanation had no basis in fact; that it was not the employer's policy or practice to respond to such problems as it did; that similarly situated persons received more favorable treatment; or that a

discriminatory attitude existed in the workplace. *See Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 727 (8th Cir.2001).

▆▆ Klyuch argues that Freightmasters has differing explanations for his termination. Freightmasters represents that it terminated Klyuch because he informed management and human resource personnel that he would quit unless he received a day shift position by February 1, 2003. Freightmaster personnel files indicate that it terminated Klyuch because of a "lay off." (Bertelson Aff. Ex. 9.) However, Klyuch did not receive severance or other compensation at the time of his separation from employment. Furthermore, Klyuch denies that his request for a day shift position was an ultimatum. Klyuch contends that if he had given an ultimatum, as Freightmasters proffers, he would have been required to follow resignation procedures. Indeed, company policy indicates that particular procedures should be followed for employee resignations. (*See* Bertelson Aff. Ex. 6; Ex. 16 at 22–23 (Gibson Dep.); Young Supp. Aff. Ex. 5 at 43–45 (Friedrich Dep.).) However, Klyuch was not required to fill out either a resignation form or submit a resignation letter. Furthermore, Freightmasters terminated Klyuch before his alleged ultimatum date, thus preventing Klyuch from actually resigning from his position. Failure to follow company procedures, coupled with other evidence, may support an inference of discrimination. *See Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1024 n. 6 (8th Cir.1998) (discussing that deviation from company policy coupled with other facts "lends support to an inference of improper motive").

Klyuch also maintains that he was treated differently than similarly situated employees. Richard Roy, who replaced Klyuch, was neither Jewish nor Russian.[2] Although Roy actually had more experience than Klyuch in the trucking industry, the record demonstrates that Klyuch had more experience than Roy in the dispatcher position. Despite Roy being less qualified for the dispatcher position, Freightmasters paid Roy $3.00 more per hour than it paid Klyuch.

▆▆ Klyuch also asserts that a discriminatory attitude against Russians and Jews existed at Freightmasters, as evidenced by discriminatory remarks and the subsequent termination of his son, Sasha. In 2001 and 2002, Beltz allegedly made discriminatory remarks about Klyuch's religion and national origin. In November 2002, Beltz decided to terminate Klyuch. In January 2003, Beltz told human resources that there was no longer a position open for Klyuch. Four days later, human resources informed Klyuch of his termination. Stray remarks that "fall short of being direct evidence of discrimi-

2. Klyuch's argument that Russ Blom was similarly situated is without merit. Blom, a Freightmasters' truck driver, was injured. Due to workers' compensation restrictions, Blom could no longer remain in his position. In February 2003, Freightmasters thus accommodated Blom and moved him to a different position. Because Blom did not have the "comprehension" to be a dispatcher, Blom's duties included answering phones and updating computer programs instead of dispatch duties. (Supplemental Young Aff. Ex. 2 at 18–19 (Kroska Dep.).) Thus, Blom and Klyuch were not similarly situated.

Furthermore, any argument that Freightmasters should have similarly accommodated Klyuch to a day shift position is without merit. In 1995, when Klyuch was injured, Freightmasters complied with its legal obligations by accommodating Klyuch and transferring him to a dispatcher position. Thus, Freightmasters treated Klyuch and Blom similarly in that it provided both a change in position as an accommodation for a medical condition.

nation" may be nonetheless probative of pretext. *See Rivers–Frison*, 133 F.3d at 621. Beltz's alleged discriminatory remarks, coupled with his decision to terminate Klyuch, could permit a reasonable jury to conclude that discrimination played a part in Freightmasters' decision to end Klyuch's employment. *See Gagnon*, 284 F.3d at 848 ("Courts look beyond the moment a decision was made in order to determine whether statements or comments made by other managerial employees played a role in the ultimate decisionmaking process"). Moreover, one day after Klyuch's termination, Freightmasters laid off Klyuch's son, Sasha. Again, Beltz informed human resources of his division's decision to terminate Sasha.

■ Viewing all of this evidence in the light most favorable to Klyuch, as the Court must do, the Court finds that this combination of facts, coupled with Klyuch's long tenure and favorable job performance, constitutes sufficient probative evidence to create a genuine issue of material fact that Freightmasters' proffered reason for Klyuch's termination is a pretext for discrimination. Thus, summary judgment is inappropriate.

**CONCLUSION**

In this case, viewing the evidence in the light most favorable to Klyuch, Klyuch has sustained his burden and presented probative evidence to create an issue of fact that Freightmasters' proffered reason for his termination is a pretext for discrimination based on his race, religion, and national origin. Therefore, Freightmasters' Motion must be denied. However, because Klyuch withdraws his claim for age discrimination, Freightmasters' Motion is granted on this point.

Accordingly, based on all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's

Motion for Summary Judgment (Clerk Doc. No. 9) is **GRANTED in part and DENIED in part**.